ALASKA PUBLIC EMPLOYEES
ASS'N, Appellant,

Alaska State Employees
Ass'n, Intervenor,

v.

STATE of Alaska, Appellee.

Nos. S–3582, S–3622.

Supreme Court of Alaska.

April 3, 1992.

Rehearing Denied May 14, 1992.

**1246**

James A. Gasper, Jermain, Dunnagan & Owens, Anchorage, for APEA.

Don Clocksin, Wagstaff, Pope & Clocksin, Anchorage, for ASEA.

Kathleen Strasbaugh, Asst. Atty. Gen., Douglas Baily, Atty. Gen., Juneau, for the State.

Kevin Dougherty, Anchorage, for amicus curiae Public Employees Local 71.

Before: RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

This case requires that we decide whether the state's classification plan for state jobs and its assignment of salary ranges to that plan are mandatory subjects of collective bargaining under Alaska's Public Employment Relations Act (PERA). We conclude that these are not mandatory subjects of collective bargaining. Accordingly, we affirm the decisions of the administrative agency and the court below.

I

Pursuant to the State Personnel Act, AS 39.25, the state must establish a "position classification plan" for all state employees covered by the Act.[1] Under such a plan, each position, or job, is assigned to a class based on duties, responsibilities, and requirements of training or experience. The Personnel Act also requires the state to establish a pay plan for all classified positions.[2] Under the pay plan, the job classes are assigned to salary ranges, and then pay rates are assigned to the salary ranges.

During the 1980s, the Alaska Public Employees Association (APEA) was the collective bargaining representative for two bargaining units of state employees—the General Government Unit (GGU) and the Supervisory Unit. Together, these two units comprised more than 7,500 state employees in approximately 1,000 different job classifications. Prior to 1987, the APEA and the state had negotiated agreements for both units that permitted the state to classify jobs and to assign salary ranges to the classifications.[3] The agreements also provided APEA with an appeal procedure by which the union could contest the state's job classification decisions and salary range assignments up through the Department of Personnel to, ultimately, the Commissioner of Administration. When the APEA and the state entered into negotiations for new agreements to replace those that expired on June 30, 1987, APEA proposed to alter the provisions covering the union's right to contest job classifications and salary range assignments. In particular, APEA wanted the new contracts to provide that all job

---

1. AS 39.25.150(1). The director of the state personnel division of the executive branch of government, the state personnel board, and the commissioner of administration all share responsibility for establishing the classification plan. *Id.*

2. AS 39.25.150(2). The director of personnel alone has responsibility for preparing, maintaining, revising, and administering the pay plan. *Id.*

3. Article 19 of the General Government Unit agreement covered job classification; Article 18 of the Supervisory Unit agreement was an identical provision.

classification and pay plan disputes would be resolved through a grievance procedure with binding arbitration as its final step.

The state, as employer, was no stranger to the sort of provision APEA attempted to bring to the bargaining table in 1987. Indeed, the state previously had negotiated collective bargaining agreements with two unions—Public Employees Local 71 (Local 71) and Public Safety Employees Association (PSEA)—that included provisions essentially identical to the one APEA proposed. Nonetheless, the state refused to consider APEA's proposed provision.

In June 1987, APEA filed with the State of Alaska Labor Relations Agency (the Agency) an unfair labor practice complaint against the state. The complaint alleged, among other things, that classification plans and salary range assignments were mandatory subjects of bargaining under PERA, AS 23.40.070–.260, and that by refusing to bargain over those subjects the state had violated the duty to bargain in good faith.

After the filing of the unfair labor practice complaint, APEA and the state tentatively approved new collective bargaining agreements. The parties also agreed to dismiss without prejudice all charges in the unfair labor practice complaint other than those related to bargaining over job classification and salary assignment. Accordingly, APEA and the state fully briefed the remaining issues and, on August 26, 1987, the Agency issued an Order and Decision in the case. The Agency concluded that job classifications and salary range assignments were permissive, but not mandatory, subjects of bargaining under PERA. This was so, explained the Agency,

> because AS 23.40.250(8) [of PERA] excludes from mandatory collective bargaining subjects, those "general policies describing the function and purposes of a public employer." Those roles include the constitutional obligation of the employer to maintain a merit system, as amplified in AS 39.25.010 [of the Person-

nel Act], and the public policy duty to maintain a rational integrated system of classification.

Consequently, the Agency held that the state had not committed an unfair labor practice when it refused to bargain over APEA's proposed contract provision.

APEA appealed the Agency's decision to the superior court. Alaska State Employees Association (ASEA), as the current bargaining representative for the GGU, was permitted to intervene; PSEA was permitted to participate as amicus curiae. On August 18, 1989, the superior court, Judge John Bosshard III, issued a Memorandum Opinion and Judgment affirming the Agency decision in the case. APEA and ASEA have appealed the superior court decision; Local 71 has entered the case as amicus curiae.

## II

■ We have applied two different standards when reviewing decisions by administrative agencies.[4] "[W]here the questions of law presented do not involve agency expertise or where the agency's specialized knowledge and experience would not be particularly probative as to the meaning of the statute," we have applied the independent judgment standard. *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 903 (Alaska 1987) (emphasis removed). However, "where the questions at issue implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function," we have applied the rational basis standard. *Id.*

Normally, a choice between these two standards of review carries particular importance as a ruling on the extent to which the courts properly should defer to an agency's decision in a particular type of case. In the present case, however, close analysis of the standard of review question would produce nothing of practical significance. At the time APEA filed its unfair labor practice complaint, AS 23.40.250(3)

---

**4.** We scrutinize the merits of the Agency's decision directly, without deference to the superior court's intermediate appellate decision. *Tesoro*

*Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 903 (Alaska 1987).

provided that the labor relations agency responsible for administering PERA with regard to the state and state employees was the state personnel board. AS 23.40.-250(3), *as enacted by* ch. 113, § 2, SLA 1972. Subsequently, the governor, by executive order, created a new labor relations agency whose responsibilities combine "the labor relations functions of the Department of Administration personnel board, the Department of Labor, and the railroad labor relations agency into one state agency, the Alaska labor relations agency, in the Department of Labor." Executive Order No. 77 (1990) (amending, *inter alia,* AS 23.40.-250(3)). We decline this opportunity to rule on the proper deference due either to the decision of a defunct agency or to the decisions of a new agency that had no involvement whatsoever with the case before us. Instead, we note that our holding today would be the same under either the independent judgment standard or the rational basis standard of review.

### III

■ The stated purpose of PERA is to give public employees "the right to share in the decision-making process affecting wages and working conditions." AS 23.40.-070.[5] Accordingly, PERA specifically requires public employers to "negotiate with and enter into written agreements with employee organizations on matters of wages,

hours, and other terms and conditions of employment." AS 23.40.070(2). Such matters are "mandatory subjects of bargaining." *Alaska Community Colleges' Fed'n of Teachers, Local 2404 v. University of Alaska,* 669 P.2d 1299, 1305 (Alaska 1983) (*Federation of Teachers*). Another section of PERA provides that " 'terms and conditions of employment' means the hours of employment, the compensation and fringe benefits, and the employer's personnel policies affecting the working conditions of the employees; but does not mean the general policies describing the function and purposes of a public employer." AS 23.40.-250(8).

As previously explained, the coordination of classification and pay plans for state employees consists of a three-step process: (1) each job is assigned to a class; (2) each job class is assigned to a pay range; and (3) salaries are assigned to each pay range. The question before us is whether steps one and two of the process properly fall within the "general policies" clause of AS 23.40.250(8).[6] If they do, then the state did not commit an unfair labor practice by refusing to negotiate with APEA on those subjects. *See* AS 23.40.110(a)(5).

### A

In this case, the Agency and the superior court both concluded that the merit principle was the most important employer policy

---

5. Section 23.40.070—"Declaration of policy"—provides in full:

 The legislature finds that joint decision-making is the modern way of administering government. If public employees have been granted the right to share in the decision-making process affecting wages and working conditions, they have become more responsive and better able to exchange ideas and information on operations with their administrators. Accordingly, government is made more effective. The legislature further finds that the enactment of positive legislation establishing guidelines for public employment relations is the best way to harness and direct the energies of public employees eager to have a voice in determining their conditions of work, to provide a rational method for dealing with disputes and work stoppages, to strengthen the merit principle where civil service is in effect, and to maintain a favorable political and social environment. The legislature declares that it is the public policy of the

state to promote harmonious and cooperative relations between government and its employees and to protect the public by assuring effective and orderly operations of government. These policies are to be effectuated by
 (1) recognizing the right of public employees to organize for the purpose of collective bargaining;
 (2) requiring public employers to negotiate with and enter into written agreements with employee organizations on matters of wages, hours, and other terms and conditions of employment;
 (3) maintaining merit-system principles among public employees.

6. All parties in this case agree that step three—assignment of actual salaries to the pay plan—is a matter of wages within the meaning of AS 23.40.070(2), and thus a mandatory subject of collective bargaining.

implicated in the classification and pay plans. We agree.

■ The Alaska Constitution requires the legislature to "establish a system under which the merit principle will govern the employment of persons by the State." Alaska Const. art. XII, § 6. Generally defined, the merit principle requires the recruitment, selection, and advancement of public employees "under conditions of political neutrality, equal opportunity, and competition on the basis of merit and competence." R. Vaughn, *Principles of Civil Service Law* § 9.3[6], at 9–27 (1976) (quoting Stanley, *What Are Unions Doing to the Merit Principle?*, 31 Pub.Personnel Rev. 109 (1970)). In actual practice, however, "the merit principle is more complex and ambiguous than the above definition reveals." *Id.* Our legislature adopted the Personnel Act for the express purpose of implementing the constitutionally mandated merit principle in state employment. AS 39.25.010(a). Clearly recognizing the complexity of its task, our legislature also provided a detailed definition for the merit principle.[7] Thus, by statute, "[t]he merit principle of employment includes ... regular integrated salary programs based on the nature of the work performed." AS 39.25.010(b). The elements of the merit principle's "salary programs," of course, are the classification plans and the salary plans adopted pursuant to AS 39.25.150.

With this understanding of the merit principle in mind, we turn now to the specific matters that the unions would have us categorize as mandatory subjects of bargaining.

## B

The easier issue on appeal relates to the state's statutory duty under AS 39.25.-150(1) to establish a job classification plan. The unions do not contend that job classification concerns wages or hours. The unions do contend, however, that the assignment of jobs to classes necessarily falls within the scope of the state's "personnel policies affecting the working conditions of the employees." AS 23.40.250(8). In response, the state argues that job classification falls within the scope of "the general policies describing the function and purposes of a public employer." *Id.* We agree with the state.

■ A salary program must begin with a carefully designed framework of job descriptions and classifications—the "position classification plan" mandated by AS 39.25.-150(1).[8] A job classification plan, then, is an integral part of the very foundation of the merit principle in state employment. Any collective bargaining provision that would affect directly the state's job classification plan also would affect directly the preeminent general policy governing state employment administration. We are convinced that AS 23.40.250(8) excludes that sort of basic policy decision from the mandatory subjects of bargaining listed in AS 23.40.070(2).[9]

7. AS 39.25.010 provides in full:

(a) It is the purpose of this chapter to establish a system of personnel administration based upon the merit principle and adapted to the requirements of the state to the end that persons best qualified to perform the functions of the state will be employed, and that an effective career service will be encouraged, developed and maintained.

(b) The merit principle of employment includes the following:

(1) recruiting, selecting, and advancing employees on the basis of their relative ability, knowledge, and skills, including open consideration of qualified applicants for initial openings;

(2) regular integrated salary programs based on the nature of the work performed;

(3) retention of employees with permanent status on the basis of the adequacy of their performance, reasonable efforts of temporary duration for correction in inadequate performance, and separation for cause;

(4) equal treatment of applicants and employees with regard only to consideration within the merit principles of employment; and

(5) selection and retention of an employee's position secure from political influences.

8. A job, or "position," classification plan first requires "a grouping together of all positions on the basis of duties and responsibilities." AS 39.25.150(1)(A).

9. As the state notes, other jurisdictions generally agree with our conclusion here. *See, e.g., In re State Employees' Ass'n of New Hampshire, Inc.,* 120 N.H. 690, 422 A.2d 1301, 1303 (1980). The

### C

We come then to the more troublesome aspect of this case. The primary problem emerges from the statutory language in the Personnel Act that charges the director of personnel with responsibility for creating personnel rules that "shall provide for"

> (2) the preparation, maintenance, revision and administration by the director of personnel of a pay plan for all positions in the classified and partially exempt services; the pay plan (A) shall be based upon the position classification plan; (B) shall provide for fair and reasonable compensation for services rendered, and reflect the principle of like pay for like work; (C) may be amended, approved, or disapproved by the legislature in regular or special session; after the pay plan is in effect, a salary or wage payment may not be made to a state employee covered by the plan unless the payment is in accordance with this chapter and the rules adopted under this chapter or unless the payment is in accordance with a valid [collective bargaining] agreement entered into in accordance with AS 23.40 [PERA]....

AS 39.25.150(2). The pay plan described in this subdivision of the statute, of course, encompasses steps two and three of the general classification and wage establishment process: after job classification is done, the pay plan assigns salary ranges to the individual classes and then assigns actual dollar figures to each salary range. All parties here agree that the assignment of actual dollar figures to the salary ranges is a matter of "wages" and thus a mandatory subject of bargaining. *See* AS 23.40.070(2). The only question is whether step two also is a mandatory subject of bargaining under AS 23.40.250(8).

To begin with, we find the final clause of subdivision (2) ambiguous. The clause alludes to the controlling effect a collective bargaining agreement might have on the actual salary or wage *payment* a covered state employee may receive. Certainly that language reinforces the conviction that the legislature intended the state to bargain collectively with public employee unions over the actual determination of salary amounts certain classified employees will receive. However, the statute does not answer the question whether the legislature also intended to give public employee unions the right to demand bargaining over salary or wage range assignments to job classes.

Other provisions of the Personnel Act bring the problem closer to focus. For example, as we have noted, the legislature's own definition of the merit principle includes "regular integrated *salary programs.*" AS 39.25.010(b)(2) (emphasis added). A salary program is the schedule produced by integrating the applicable job classification plan with the applicable pay plan. *See* AS 39.25.150(1) & (2). Thus, arguably, the first aspect of the pay plan—the assignment of salary ranges to job classes—actually embodies, in practical form, the state's preeminent policy of establishing a system of personnel administration according to the merit principle. Accordingly, we agree with the state that collective bargaining over assignment of salary ranges to job classes necessarily impinges upon the merit principle, which generally is not a mandatory subject of bargaining.

On the other hand, we also agree with the unions that the assignment of salary ranges to job classes undeniably impinges upon the issue of "compensation ... and the employer's personnel policies affecting the working conditions of employees," AS 23.40.250(8), which usually are mandatory subjects of bargaining. Thus, on the issue of salary range assignments, employee and governmental interests substantially overlap. It is precisely this overlapping of interests that we recognized when we recently called the problem of categorizing the issue "a close and difficult question." *State v. Public Safety Employees Ass'n,* 798 P.2d 1281, 1287 (Alaska 1990) (*Public*

---

unions, by contrast, have not brought a single authority to our attention in support of their

argument that job classification is a mandatory subject of bargaining.

*Safety Employees Ass'n*).[10]

■ Of course, in some respects, the overlap of employer and employee interests on this issue actually may benefit public employment administration. As we explained in *PSEA:*

> State employees are as familiar with their qualifications and positions as their administrators are. They may be able to make a valuable contribution to the process of assigning positions to salary ranges. In this respect, giving public employees a voice in matters like salary range classification seems consistent with the purposes of the [Personnel] Act.

*Id.* at 1286. Consequently, the assignment of salary ranges clearly should be a *permissive* subject of bargaining. The state definitely should give its employees a voice in salary range assignments, by bargaining over the assignments, when the state considers such interaction beneficial to the larger mission of public employment. Nevertheless, the final question is whether unionized employees should have the power to *constrain* the state to bargain collectively over matters related to the merit principle. We believe that a satisfactory answer to this question emerges when we interpret the controlling statutes in light of our own prior cases on the proper scope of collective bargaining under PERA.

In *Kenai Peninsula Borough School Dist. v. Kenai Peninsula Educ. Ass'n*, 572 P.2d 416 (Alaska 1977) (*Kenai I*), we enunciated a general balancing test for determining whether an issue of public education was negotiable in collective bargaining between a teachers' union and the local government under AS 14.20.550–.610 (medi-

ation and negotiation in public education employment). In general, we wrote, "a matter is more susceptible to bargaining the more it deals with the economic interests of employees and the less it concerns professional goals and methods." *Id.* at 422. Subsequently, of course, we held that PERA establishes the distinction between mandatory and permissive subjects of bargaining and makes refusal to bargain over mandatory subjects an unfair labor practice. *Federation of Teachers*, 669 P.2d at 1305. We now adapt the *Kenai I* balancing test for "negotiability" to the *Federation of Teachers* division between mandatory and permissive subjects of bargaining in cases, such as this one, where the government employer's constitutional, statutory, or public policy prerogatives significantly overlap the public employees' collective bargaining prerogatives. We conclude that a matter is more susceptible to categorization as a mandatory subject of bargaining the more it deals with the economic interests of employees and the less it concerns the employer's general policies.

■ When we apply this test in the present case, we conclude that salary range assignment cannot be a mandatory subject of bargaining under the state's present system of implementing its "regular, integrated salary programs." Admittedly, state employees have strong economic interests in the assignment of salary ranges to classifications. However, the countervailing policy concern at work here is, by specific provision of the Personnel Act, the weightiest one in the state employer's trust. *See* Alaska Const. art. XII, § 6; AS 39.25.010. No similarly specific prerogative exists on the unions' side of the balance. Indeed, in

---

10. In *Public Safety Employees Ass'n* we also noted that "[d]ecisions in other jurisdictions are not very helpful because many states have more detailed provisions addressing this question." 798 P.2d at 1286. Indeed, even when other courts address the question of mandatory public sector bargaining in general terms, the results are idiosyncratic. *Compare Central Michigan Univ. Faculty Ass'n v. Central Michigan Univ.*, 404 Mich. 268, 273 N.W.2d 21, 26 (1978) (even if aspect of employment relationship may be said to be only minimally a condition of employment, it is a mandatory subject of bargaining) *with University Educ. Ass'n v. Regents of the*

*Univ. of Minnesota*, 353 N.W.2d 534, 539 (Minn. 1984) (if term or condition of employment and employer's managerial policies "are so 'inextricably interwoven' that negotiation of the issue involves negotiation of the policy," then the issue is not a mandatory subject of bargaining). Commentators likewise present sharply diverging views on the proper scope of public sector collective bargaining. *Compare* Summers, *Public Employee Bargaining: A Political Perspective*, 83 Yale L.J. 1156, 1192–94 (1974) *with Developments in the Law—Public Employment*, 97 Harv. L.Rev. 1611, 1684–99 (1984).

PERA the legislature expressly reinforces the importance of the merit principle and rather pointedly refrains from stating that implementation of the merit principle may ever be mandatorily contingent upon the approval of its employees or of outside arbitrators. *See* AS 23.40.070.[11] This contrast between the state's strong, specific, express mandate to act and the employees' more diffuse, general, limited entitlement to bargain is important in our balance of the competing interests here.

Also important to our decision here, however, is the fact that the collective bargaining representatives of state employees may demand that the state bargain over the actual pay scales assigned to the state-designed salary ranges. Thus, the employees do have some mandatory influence, at the most concrete level, in the final shape of their pay plans. If this were not so, then the employees' interest in the assignment of salary ranges would increase markedly and might outweigh the state's interest in the merit principle, insofar as the principle inheres in assignment of salary ranges to job classes. *Accord* AS 23.-40.070 (purpose of PERA is to grant public employees "the right to share in the decision-making process affecting wages and working conditions" through collective bargaining); AS 39.25.150(2) (Personnel Act approves determination of wage payments according to collective bargaining agreements entered into under PERA). On its face, however, the mandatory right to bargain over the final step by which the state integrates its job classification and pay plans currently provides unionized employees adequate exercise of the mandatory bargaining prerogative granted them in AS

23.40.070(2). Accordingly, we hold that the assignment of salary ranges to job classes is not a mandatory subject of collective bargaining between the state and its employees' collective bargaining representatives.

### IV

■ APEA also argued before the Agency, and now argues on appeal, that even if job classification and salary range assignment are not mandatory subjects of collective bargaining, the state still must submit disputes over those issues to binding arbitration. We disagree. Binding arbitration is not absolutely available when the matter in dispute is not a mandatory subject of bargaining. *See Kenai Peninsula Educ. Ass'n v. Kenai Peninsula Borough School Dist.*, 628 P.2d 568, 569 & n. 1 (Alaska 1981).

■ APEA's agreements with the State contained no provision for mandatory arbitration of classification plan and pay range assignment disputes, and no basis exists for the implication of such a remedy. *See supra* note 3 and accompanying text (describing APEA's bargained-for appeals procedure for the state's job classification and salary range assignment decisions). Under the facts of this case, the state's actions related to job classification and salary range assignments are not subject to binding arbitration.

The superior court decision affirming the State Labor Relations Agency Order and Decision No. 110 is AFFIRMED.

---

**11.** The declaration of policy in PERA expressly includes a mandate to *coordinate* four distinct, and in some sense competing, interests:

> The legislature ... finds that the enactment of positive legislation establishing guidelines for public employment relations is the best way to harness and direct the energies of public employees eager to have a voice in determining their conditions of work, to provide a rational method for dealing with disputes and work stoppages, to strengthen the merit principle where civil service is in effect, and to maintain a favorable political and social environment.

AS 23.40.070 (quoted in full *supra* note 5). Moreover, the final subsection of AS 23.40.070 reiterates the importance of the merit principle in public employment. *Id.* at (3). Thus, nowhere does AS 23.40.070 state or imply that collective bargaining and employee organizing shall be integral parts of a merit system of employment. On the contrary, PERA's declaration of policy always refers to the merit principle as an important, independent policy that may *limit* employee rights if those rights conflict with the merit principle.

COMPTON, Justice, with whom RABINOWITZ, C.J. joins, dissenting in part.

The court concludes that the assignment of position classifications to salary ranges is not a mandatory subject of collective bargaining. I do not agree with this conclusion and therefore dissent. In all other respects I agree with the court.

I agree that the constitutionally mandated merit system,[1] and the State Personnel Act (Personnel Act)[2] which implements it, take precedence over the Public Employment Relations Act (PERA)[3] to the extent that there is a conflict between them. However, the court has not articulated any conflict between the merit system and Personnel Act on the one hand and PERA on the other, nor is any apparent.

An examination of the steps to be taken under AS 39.25.150(1) and (2) is necessary for an understanding of the case. The first step is the development of the position (job) classification plan. This entails "(A) a grouping together of all positions into classes on the basis of duties and responsibilities; [and assigning] (B) an appropriate title, a description of the duties and responsibilities, training and experience qualifications, and other necessary specifications for each class of positions." AS 39.25.150(1).[4]

For example, within Department A certain employees, who have had similar education or on-the-job training, have jobs with roughly equivalent duties and responsibili-

ties. They have in common other objectively determinable characteristics considered necessary to perform this job. The employer determines that this job will be titled "Operator I." Thus, in order to assume the duties and responsibilities of an Operator I, an employee must have the education or training and other previously identified characteristics which the employer now specifies in a job description. Applying this procedure to all employees within all departments will result in a number of different job classifications.

The second step is development of the pay plan. It is based on the job classification plan and "shall provide for fair and reasonable compensation for services rendered, and reflect the principle of like pay for like work." AS 39.25.150(2).

Development of the pay plan involves several considerations. At some point a wage for each job must be identified, i.e., what wage should an Operator I be paid? Presumably the employer will refer to available wage data regarding wages paid to other public employees, and perhaps private employees, for comparable employment. By this process "fair and reasonable compensation for services rendered" should be established. Wage comparability also must be applied in order to effectuate the principle of "like pay for like work."

The employer and union determine the available ranges into which each job classification ultimately will be placed.[5] If the

1. Article XII, section 6 of the Alaska Constitution provides: "The legislature shall establish a system under which the merit principle will govern the employment of persons by the State."

2. AS 39.25.010 identifies the purpose of the State Personnel Act as follows:
It is the purpose of this chapter to establish a system of personnel administration based upon the merit principle and adapted to the requirements of the state to the end that persons best qualified to perform the functions of the state will be employed, and that an effective career service will be encouraged, developed and maintained.

3. AS 23.40.070–.260.

4. In its rebuttal brief before the Alaska Labor Relations Agency, the state declared:

The very essence of the State's function in the execution of these constitutional and statutory mandates is the description of the work to be performed, the determination of the knowledge, skills and abilities of employees necessary to perform such work and the allocation of that work for pay purposes.

5. It is not disputed that ranges are freely negotiated in the collective bargaining process. APEA provides the following example:
The State and the union negotiate over the appropriate salary schedule deciding the "pure" wage for an employee, e.g., Range 16, Step A salaries are $2,702 per month, $2,895 per month, or $2,518 per month. Determining a particular employee's compensation requires matching the wage within the Range Schedule to the employee's classification.
Presumably the wage data which are used to establish "fair and reasonable compensation"

job classification of Operator I in Department A and Examiner III in Department B are roughly equivalent in terms of duties, responsibilities and qualifications, these classifications should be grouped together for the purpose of assignment to a range.[6] Applying this procedure to all job classifications will result in the emergence of a number of different job classification groupings and ranges. A hierarchy of ranges will be established. If there are ten such groupings, they may be denominated Ranges I through X. These ranges are commonly referred to as "salary ranges."

The court holds that development of the *job classification plan* is a matter that is not a mandatory subject of collective bargaining. I agree. However, one of the two integral components of the *pay plan* is the placement of the employee's job classification in a particular salary range by the personnel director. This determines how much a specific employee will receive as wages. The court holds that this also is not a mandatory subject of collective bargaining. I disagree.

This court said in *Kenai Peninsula Borough School District v. Kenai Peninsula Education Association*, 572 P.2d 416, 422 (Alaska 1977) (*Kenai I*), that "a matter is more susceptible to bargaining the more it deals with economic interests of employees and the less it concerns professional goals and methods." Except for assignment of dollar figures to salary ranges, *nothing* deals with the economic interests of employees more than assignment of job classifications to those salary ranges.

The state argues that assignment of job classifications to salary ranges is a "general polic[y] describing the function and purpose[ ] of a public employer," and therefore does not fall within AS 23.40.250(8)'s definition of "terms and conditions of employment." The essence of the state's argument is that denying the state complete control over job classification decisions will undermine the merit system[7] since otherwise the state will have to bargain with the union over the placement of approximately 1,000 different job classifications across multiple salary ranges. Further, according to the state, the stated purpose of PERA to maintain "merit-system principles among public employees," AS 23.40.070(3), indicates the clear intent of the legislature to immunize the state's job classification decisions from mandatory bargaining obligations.

The court's analysis proceeds along similar lines. The court notes that the merit system defined in AS 39.25.010(b)(2) embodies "regular integrated salary programs." *Op.* at 1250. A salary program "is the schedule produced by integrating the applicable job classification plan with the applicable pay plan. *See* AS 39.25.150(1) & (2)." *Id.* From this the court declares that "arguably, the first aspect of the pay plan—the assignment of salary ranges to job classes—actually embodies, in practical form, the state's preeminent policy of establishing personnel administration according to the merit principle." *Id.* Reasoning from what it has declared to be arguable, the court then opines that bargaining over assignment of salary ranges to job classifications "necessarily impinges upon the merit principle." *Id.* Thus it concludes that assignment of salary ranges to job classifications is not subject to collective bargaining.[8]

and "like pay for like work" for each job classification will also be used to establish groupings of job classifications and salary ranges.

**6.** In its rebuttal brief before the Alaska Labor Relations Agency, the state declared: "As described earlier, each job is analyzed and assigned to a classification with groups of classifications assigned to a pay range."

**7.** *Amicus Curiae* Public Employees Local 71 points out that it has negotiated assignment of job classifications to salary ranges since 1972, with binding arbitration where an impasse re-

sulted. The state's response is simply that because it permitted this subject to be negotiated does not mean that the subject is required to be negotiated. The state's reasoning may be flawless. However, it points to no incident when negotiation of this subject, and submission of the subject to binding arbitration, has "impinged" on the merit system. Neither does the court.

**8.** As acknowledged by the court in *State v. Public Safety Employees Association*, 798 P.2d 1281, 1286 (Alaska 1990), decisions in other jurisdictions supporting the Alaska Labor Relations

Having already arrived at its ultimate conclusion, the court then acknowledges that assignment of job classifications to salary ranges also impinges on the issue of compensation. This leads the court to remark that "on the issue of salary range assignments, employee and governmental interests substantially overlap." *Op.* at 1251. The "overlap of employer and employee interests on this issue actually may benefit public employment administration.... Consequently, the assignment of salary ranges clearly should be a *permissive* subject of bargaining." *Op.* at 1251.

The court's reliance on an overlapping of interests to exclude from mandatory collective bargaining the assignment of job classifications to salary ranges is misplaced. The employer's and employees' interests will always overlap, to a greater or lesser degree.

It must be noted that assignment of dollar figures to salary ranges, the other integral component of the pay plan required by AS 39.25.150(2), does not impinge on the merit principle. The state does not claim that it does. Instead, the state acknowledges that assignment of dollar figures to ranges "is a matter of 'wages' and thus a mandatory subject of bargaining." *Op.* at 1250. The court does not question either the state's analysis or its conclusion regarding the propriety of assignment of dollar figures to salary ranges.

The state's differentiation between assignment of job classifications to salary ranges and assignment of dollar figures to salary ranges is significant. Neither the text of the Personnel Act nor its legislative history presumes or implies any differentiation between these two processes. This underscores the flaw in the state's argument and the error to which it leads the court.

Alaska Statute 23.40.070(2) requires that "public employers ... negotiate with and enter into written agreements with employee organizations on matters of wages, hours, and other terms and conditions of employment." In turn, AS 23.40.250(8) defines "terms and conditions of employment" to mean "the hours of employment, the compensation and fringe benefits, and the employer's personnel policies affecting the working conditions of the employees; but does not mean the general policies describing the function and purposes of a public employer." The economic impact on an employee's wages and compensation by assignment of an employee's job classification to one salary range rather than another is both significant and obvious. APEA provides the following example:

> For instance, if the employee classification "Accounting Technician III" is assigned to Range 16, a new hire (Step A) is paid $2,702 per month. If the classification is assigned to Range 17, the new hire will receive $2,895 per month; if Range 15 is the salary benchmark, the employee's monthly wages are $2,518. If an Accounting Technician III has a level of responsibility greater than an Accounting Technician II, then that fact is reflected in the wages paid.

I am not persuaded by the state's argument that decisions affecting assignment of job classification to salary ranges are "general policies" within a public employer's exclusive control. I conclude that "wages, hours, and other terms and conditions of employment" under AS 23.40.-

---

Agency's conclusion that the assignment of job classifications to salary ranges is not a mandatory subject of bargaining are not very helpful. Many states have more detailed provisions addressing the issue:

> For example, based upon a very specific merit system exception to the definition of the terms and conditions of employment, the New Hampshire Supreme Court has held that most subjects within the jurisdiction of the Personnel Commission, including salary classification, are not negotiable. *State Employees' Ass'n v. New Hampshire Pub. Employee Labor*

*Relations Bd.* [118 N.H. 885] 397 A.2d 1035 (N.H.1978). Similarly, a New York court held that classification of court employees is not a mandatory subject of bargaining because the legislature specifically declared that "allocations and reallocations to salary grades of positions in the classified service of the state are not terms and conditions of employment...." *Evans v. Newman,* 71 A.D.2d 240, 423 N.Y.S.2d 59, 62 (1979).

798 P.2d at 1286.

This court agrees with its prior assessment. *Op.* at 1251 n. 10.

070(2), and "terms and conditions of employment" under AS 23.40.250(8), clearly include assignment of job classifications to salary ranges, and thus are mandatory subjects of collective bargaining. Seemingly the court does also, for in accepting the unions' argument, the court declares that "assignment of salary ranges to job classes undeniably impinges upon the issue of 'compensation ... and the employer's policies affecting the working conditions of employees.'" *Op.* at 1250.

Job classification decisions do not concern professional goals and methods in the same way as do those matters, such as determination of class size and evaluation of administrators, that the court held non-negotiable in *Kenai I*, 572 P.2d at 424. It is not obvious that assignment of job classifications to salary ranges falls within "the general polic[y] describing the function and purpose[] of a public employer." AS 23.-40.250(8).

The unions' position that collective bargaining over assignment of job classifications to salary ranges does not undermine the merit system is persuasive, in the absence of any articulated reasons or evidence to the contrary. I reiterate what the court has already quoted from *State v. Public Safety Employees Association*, 798 P.2d 1281, 1286 (Alaska 1990) *quoted in Op.* at 1251:

> State employees are as familiar with their qualifications and positions as their administrators are. They may be able to make a valuable contribution to the process of assigning positions to salary ranges. In this respect, giving public employees a voice in matters like salary range classification seems consistent with the purposes of the [Personnel] Act.

Unfortunately, the court then silences the voice of these same public employees by immediately declaring that assignment of job classifications to salary ranges should be a subject of *"permissive"* collective bargaining. "The state definitely should give its employees a voice in salary range assignments, by bargaining over assignments, *when the state considers such interaction beneficial to the larger mis-*

*sion of public employment." Op.* at 1251 (emphasis added).

Assignment of dollar figures to salary ranges is a matter of "wages" and thus a mandatory subject of collective bargaining. Yet as important as are salary ranges, they are meaningless until job classifications are assigned to them. Nonetheless, the court concludes that this step in the development of the *pay plan* is not a mandatory subject of collective bargaining, only a permissive subject of collective bargaining. In so concluding, the court necessarily determines that assignment of job classifications to salary ranges is not a matter of "wages, hours, and other terms and conditions of employment." Since "[e]mployers are free to make unilateral changes on matters which fall outside these mandatory subjects (wages, hours, and other terms and conditions of employment) of bargaining," *Alaska Community Colleges' Federation of Teachers, Local No. 2404 v. University of Alaska*, 669 P.2d 1299, 1305 (Alaska 1983), the state will be free unilaterally to reassign job classifications to salary ranges. In just what way this type of unilateral action on the part of the public employer encourages, develops and maintains an effective career service is not explained.

On the contrary, if we recognize a state right to unilaterally reassign job classifications, the real possibility exists that the merit principle will be impinged. In addition to "regular integrated salary programs" on which the court focuses, the merit principle includes "selection and retention of an employee's position secure from political influences." AS 39.25.-010(b)(5). Where individuals who are in political disfavor are employed in identifiable job classifications, the potential exists for abuse of a state right to unilaterally reassign a job classification to a lower range.

Job classification is the responsibility of the director of personnel, *subject to* approval of the commissioner of administration and personnel board. AS 39.25.150(1). The personnel board is comprised of three persons, not more than two of whom may

be from the same political party. They are appointed by the governor and confirmed by the legislature. On the other hand, the pay plan is the responsibility of the director of personnel alone. AS 39.25.150(2). The legislature, in regular or special session, may amend, approve or disapprove of the pay plan. *Id.* This difference is significant because of the greater power vested in one person, the director of personnel, in preparing, maintaining, revising and administering the pay plan.

At the outset of its opinion, the court acknowledged that "[t]he stated purpose of PERA is to give public employees 'the right to share in the decision-making process affecting wages and working conditions.'" *Op.* at 1248. Concluding that assignment of job classifications to salary ranges is a matter for only *permissive* collective bargaining is a repudiation of sharing in any sense of the word.

I would reverse the decision of the superior court, which upheld Alaska Labor Relations Agency Order and Decision No. 110, and direct that the case be remanded to the ALRA with directions that the public employer be ordered to enter into mandatory collective bargaining with the unions over assignment of job classifications to salary ranges.